# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PANAMA CITY DIVISION

**RHONDA DUBLAK,**
      **Plaintiff,**

**v.**                                             **Case No. 5:10cv14/RH/CJK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
            **Defendant**.

---

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Northern District of Florida Local Rules 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.  The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits and supplemental security income ("SSI") benefits under Titles II and XVI of the Act, 42 U.S.C. §§ 1381-83.

Upon review of the record before this court, the undersigned concludes that the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner therefore should be affirmed.

## PROCEDURAL HISTORY

On March 10, 2006, plaintiff, Rhonda Dublak, protectively filed applications for disability insurance benefits and SSI benefits, alleging disability beginning

August 1, 2005.  Plaintiff's applications were denied initially and on reconsideration. Following a hearing, the administrative law judge ("ALJ") issued a decision in which he found plaintiff "not disabled" at anytime through the date of the decision.  On December 8, 2009, the Appeals Council denied plaintiff's request for review.  The ALJ's decision thus stands as the final decision of the Commissioner and is now subject to review in this court pursuant to section 1383(c) of the Act.

## FINDINGS OF THE ALJ

In his written decision the ALJ made several findings relative to the issues raised in this appeal:

1) Plaintiff has not engaged in substantial gainful activity since August 1, 2005, the date she alleges she became disabled.

2) Plaintiff has the following severe impairments:  history of right rotator cuff injury with repair, bilateral carpal tunnel syndrome, hemangioma of liver, history of asthma, and lumbar spondylosis.

3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4) Plaintiff has the residual functional capacity to lift and carry ten pounds occasionally and frequently with the dominant right upper extremity; lift and carry 20 pounds occasionally and ten pounds frequently with the left upper extremity; stand and walk six hours in an eight-hour workday and sit up to six hours; climb, balance, stoop, kneel, crouch, and crawl occasionally; frequently perform right and left fine and gross manipulation; reach overhead occasionally with the right upper extremity.

Plaintiff cannot be exposed to heights or hazards, and cannot withstand concentrated exposure to pulmonary irritants or vibration.

5) Plaintiff is able to perform her past relevant work as an office manager, administrative clerk, and motel desk clerk.  This work does not require the performance of work-related activities precluded by plaintiff's residual functional capacity.  Plaintiff, therefore, has not been under a disability, as defined in the Social Security Act, since August 1, 2005.

## STANDARD OF REVIEW

"Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards."  *Olds v. Astrue*, No. 5:09cv319/RS/EMT, 2011 WL 691595, at *1 (N.D. Fla. Jan. 19, 2011); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(1)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  *See* 20 C.F.R. § 404.1512.  "If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to

show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Olds*, 2011 WL 691595, at *2. "If the Commissioner carries this burden, the claimant must then prove [she] cannot perform the work suggested by the Commissioner." *Id.*

<u>FACT BACKGROUND AND MEDICAL HISTORY</u>

Plaintiff was born on November 4, 1962, making her 42 years old at the alleged onset date. Plaintiff has an eleventh grade education, but has not obtained a GED. (Doc. 17-2, pp. 28-29, 31). She has past relevant work as an office manager, administrative clerk, motel desk clerk, radio dispatcher, and assembler. (Doc. 17-2, pp. 32-48). In her last employment, shortly before she filed the application for benefits, plaintiff was office manager for The Carpet Center in Nevada. She did payroll, had supervisory responsibility for a number of other employees, and was proficient with Excel and QuickBooks. Plaintiff described the job as "sit-down" with occasional lifting of ten pounds or less. (Doc. 17-2, p. 34).

On September 13, 2005, plaintiff saw Dr. M. Dean Smith, D.O., complaining of migraine headaches, neck stiffness, right shoulder pain, and sleeping problems. She also told the doctor she had fibromyalgia. Dr. Smith, noting muscle spasms and tenderness, referred plaintiff for physical therapy and to a neurologist, and prescribed Lortab, a pain medication. (Doc. 17-9, p. 559). Plaintiff returned to Dr. Smith's office on October 18, 2005, reporting that she had seen a neurologist, who believed she had a rotator cuff problem. Dr. Smith, noting that plaintiff had reduced range of motion in the right shoulder and inability to reach her hand to her head, referred plaintiff to an orthopedist and requested an x-ray of the troublesome shoulder. (Doc.

17-9, p. 556).  The x-ray of plaintiff's right shoulder showed no evidence of fracture or dislocation and was generally "unremarkable."  (Doc. 17-7, p. 301).

On March 8, 2006, plaintiff followed up with Dr. Smith regarding her fibromyalgia.  Dr. Smith observed significant trigger point spasms in plaintiff's right upper trapezius and supraspinatus muscles, as well as a tremor in plaintiff's right arm and hand.  In light of these symptoms, Dr. Smith referred plaintiff to a neurologist.  (Doc. 17-9, p. 543)  Plaintiff returned to Dr. Smith's office two days later, at which time the doctor noted  weakness, tenderness, and spasms in plaintiff's right arm.  On that March 10 visit, plaintiff asked Dr. Smith if she could get disability for her "right arm pain and weakness and spasms."  (Doc. 17-9, p. 593).  Dr. Smith requested an MRI of plaintiff's cervical spine and again referred plaintiff to a neurologist.  (Doc. 17-9, p. 541).  Again the MRI returned "unremarkable."  (Doc. 17-7, p. 289).

When plaintiff returned to see Dr. Smith on August 8, 2006, she reported that she had been seen by Dr. John Freeman, D.O., who told plaintiff she suffered from carpal tunnel syndrome, placed her in splints, and recommended that she visit a hand surgeon.  (Doc. 17-9, p. 529).   Dr. Smith assessed her condition as allergies, carpal tunnel syndrom, and neck pain.  (Doc. 17-9, p. 581).  Plaintiff complained of left hip pain when she next saw Dr. Smith on September 18, 2006, stating that her hip had bothered her "for a long time."  Dr. Smith noted reduced range of motion in the hip joint and that plaintiff sometimes walked with a limp.  Dr. Smith assessed hip strain and recommended physical therapy and, after a subsequent visit, trigger point injections.  (Doc. 17-9, pp. 521, 525).

Plaintiff saw another doctor, Dr. Salvatore G. LaCognata, for shoulder pain.  Dr. LaCognata examined plaintiff on December 8, 2005, for complaints of right

shoulder pain, noting tender points in the trapezius, biceps, and triceps, in addition to weakness and reduced range of motion in the right shoulder.  (Doc. 17-9, p. 569).  A January 2006 MRI of the shoulder showed, *inter alia*, a tear of the supraspinatus tendon and a posterior paralabral cyst.  (Doc. 17-7, p. 299).  On February 1, 2006, Dr. LaCognata performed a repair on plaintiff's right rotator cuff at Arizona Orthopedic Hospital.  (Doc. 17-9, pp. 570-71).  Plaintiff returned to Dr. LaCognata's office several times in the following months, including on September 7, 2006, when she complained of right shoulder, neck, and thoracic back pain.  Dr. LaCognata observed spasms in the muscles of the neck and trapezius.  (Doc. 17-9, pp. 564-66).

Dr. Ashok Narayan, a neurologist, examined plaintiff on October 10, 2005, when plaintiff complained of headaches, right shoulder pain, and neck pain.  Plaintiff reported that she had been in two motor vehicle accidents (one in February 2004 and the other in June 2005) and that she experienced headaches at least twice per month that caused her to see bright-colored lights.  Dr. Narayan noted that plaintiff's neck movements were restricted and painful.  Following a cortisone injection in her right shoulder in December 2005, plaintiff again saw Dr. Narayan and reported hand tremors.  Dr. Narayan started plaintiff on Neurontin, which he prescribed for relief of postural tremors.  (Doc. 17-8, pp. 431-35).  Dr. Narayan's assessments over his treatment period focused upon headaches and the right rotator cuff syndrome, ultimately repaired by Dr. LaCognata.

Dr. Freeman, a specialist in physical medicine, saw plaintiff for the first time on July 3, 2006, on referral from Dr. Smith, when plaintiff presented with neck and shoulder pain, tremors, and weakness in the right upper extremity.  Dr. Freeman recommended that plaintiff return after undergoing an EMG and nerve conduction

study.  (Doc. 17-7, pp. 320-21).  The results of that procedure, which was done to evaluate the patient for radiculopathy, plexopathy, and peripheral neuropathy, showed that plaintiff suffers from carpal tunnel syndrome bilaterally.  (Doc. 17-7, pp. 315-18).

Having moved from Arizona to Florida, plaintiff came under the care of Dr. Mark Akerson on December 12, 2006.  Upon examination, Dr. Akerson noted mild lumbar discomfort with some spasms.  Dr. Akerson gave plaintiff a prescription for Flexeril, a muscle relaxant, and increased plaintiff's dosage of Lortab from 5 mg to 7.5 mg.  (Doc. 17-8, pp. 504-05).  Plaintiff returned to see Dr. Akerson in January 2007, citing pain across her neck and shoulders, asthma attacks, and right leg numbness.  Dr. Akerson observed sacroiliac joint bursitis, spinal spasms, and limited range of motion.  In consequence, Dr. Akerson administered to plaintiff a cortisone injection to the sacroiliac joint and the right hip.  (Doc. 17-8, p. 507).  Thereafter, plaintiff continued to receive injections from Dr. Akerson for her lower back and hip pain. (Doc. 17-8, pp. 501, 511-12).  In September 2007, Dr. Akerson ordered an MRI of plaintiff's lumbar spine, which showed mild to moderate protrusion at L4-5 and L5-S1, possible nerve root compression, and lumbar spondylosis.  (Doc. 17-8, pp. 429-30).

At the request of the state (Arizona) agency, plaintiff attended physical and psychological evaluations conducted by Drs. Wayne Broky and David Young, respectively.  Dr. Broky examined plaintiff on September 5, 2006, at which time plaintiff reported pain in her neck and right shoulder, tremors in her right hand, and bilateral carpal tunnel syndrome.  Plaintiff alleged that the pain originated from a February 2004 motor vehicle accident.  Plaintiff also complained of neck and

shoulder spasms, tingling and numbness in the scapular region, and weakness in her hands.  Dr. Broky observed decreased motion in plaintiff's right shoulder and in the cervical spine, as well the tremor plaintiff described in her right hand.  (Doc. 17-7, pp. 328-35).

Dr. Young saw plaintiff for a psychological evaluation, during which plaintiff complained of feelings of depression and anxiety.  Plaintiff also reported having nightmares, but Dr. Young observed only moderate limitations in plaintiff's ability to interact with the general public, accept instructions, and respond appropriately to criticism from supervisors.  (Doc. 17-8, pp. 373-74).  Noting that plaintiff attempted suicide at the age of 16, Dr. Young ultimately diagnosed mild anxiety disorder and major depression, single episode.  As of the time of the evaluation, Dr. Young characterized plaintiff's condition as "mild symptoms of depression and anxiety." (Doc. 17-8, p. 376).

Represented by counsel, plaintiff testified at the July 15, 2008, hearing that her most severe pain is in her hips, low back, neck, and hands.  (Doc. 17-2, pp. 60-66). Plaintiff explained that her hands "fall asleep" or go numb when she engages in routine activities like driving or reading a book.  (Doc. 17-2, pp. 49, 74, 76).  Plaintiff reported that she had been taking Lortab for pain since 2004 and that her fibromyalgia causes general soreness.  (Doc. 17-2, pp. 52-57).  Regarding her physical limitations, plaintiff asserted that she can sit for 30 minutes before having to stand, but can stand only for 30-45 minutes at a time.  Plaintiff alleged that she can walk for about 30 minutes and can on occasion lift/carry a half gallon of milk.  (Doc. 17-2, pp. 66-67). According to plaintiff, she does the dishes and laundry, makes her bed, feeds her pet

cats, sweeps the floors, and cooks and grocery shops to a limited degree.  (Doc. 17-2, pp. 68-69).

After plaintiff testified, the ALJ reviewed with the vocational expert, Robert Bradley, plaintiff's employment history for 15 years before her disability application. The ALJ then posed two hypothetical questions to the vocational expert.  First, the ALJ asked if Mr. Bradley could  identify any of plaintiff's past occupations in which a person with the same age, education, and physical limitations as plaintiff could engage.  The ALJ modified the second hypothetical, adding the caveat that the person would need to alternate between sitting and standing every 15-30 minutes.[1]  (Doc. 17-

_____

[1] Given plaintiff's contention with the hypotheticals, I have set out verbatim the questions utilized by the ALJ:

Q  I want you to assume we have a hypothetical individual with the same age and education as the Claimant which is eleven years and almost a GED, one point away, right?

A  Yes.

Q  And such a person would have a similar vocational background as what you've testified to, any work activity this person would be able to do besides the following conditions and limitations.  For the upper extremities, as far as lifting goes, on the right hand side, she could lift ten pounds with her left upper extremity lift twenty on an occasional basis.  And in addition with both extremities she could lift ten pounds on a frequent basis.  This person is right hand dominant. In addition, the person could engage in occasional postural maneuvers, climb, balance, stoop, kneel, crouch and crawl.  The person should not be exposed to heights or hazards at all.  No continuous exposure to pulmonary irritants or vibration.  Occasional overhead reaching with the right upper

2, pp. 81-82).  Bradley responded that a person operating under the limitations described in the first hypothetical could perform all past work except dispatcher and assembler.  Such a person could work as a motel clerk with the sit/stand option. (Doc. 17-2, p. 83).  Bradley testified that a person missing 1-1 ½ hours of work per day after using all accrued leave time could not be competitively employed in the national economy.  Bradley ventured the same assessment for a person who for any reason had to miss 3-4 days of work per month after using accrued leave time. Finally, Bradley opined that a lack of fine dexterity or inability to grasp would not preclude work.  (Doc. 17-2, pp. 82-87).

## DISCUSSION

Plaintiff argues first that the ALJ failed to pose a complete hypothetical question to the vocational expert, making his testimony unsubstantial evidence. Specifically, plaintiff cites the ALJ's failure to delineate how long the hypothetical person can sit, stand, or walk.[2]  At the administrative hearing, plaintiff posed no

---

extremity, frequent gross and fine manipulation on the right and left and this person is right hand dominant.  The second hypothetical is identical to the first other than this person could need a sit/stand option alternating every 30 minutes, 15 to 30 minutes.  Okay?

[2] Plaintiff's entire argument on this point reads as follows:

When the ALJ posed the hypothetical questions to the Vocational Expert, Robert Bradley, he failed to mention anything about how long the person could sit, stand or walk.  (Tr. 82).  He added a sit/stand option to the second hypothetical question but still didn't mention anything about limitations on walking.  (Id.).  In the ALJ's decision he states that Ms. Dublak can, "stand and walk 6 hours in an 8-hour

objection to either of the hypotheticals used by the ALJ.   Plaintiff is correct that the ALJ did not expressly identify plaintiff's sitting and standing limitations when posing the aforesaid hypotheticals to Bradley, the vocational expert.    Under some circumstances, such an omission might prove fatal to the legal substantiality of Bradley's testimony.  *See Russell v. Astrue*, 331 F. App'x 678, 683 n.4 (11th Cir. 2009) ("We note that for vocational expert testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which includes all of the claimant's impairments.").   Here, however, Bradley by implication accounted for plaintiff's sitting and standing limitations, which are consistent with the requirements of the sort of "light work" for which Bradley assessed her.  *See Hutchison v. Bowen*, 787 F.2d 1461 (11th Cir. (1986) (finding substantial evidence to support ALJ's finding that disability claimant was capable of performing full range of light work,

---

workday and sit up to 6 hours." (Tr. 18).   Further, the ALJ did not consider the effects of Ms. Dublak's fibromyalgia when posing his hypothetical questions to the VE.    According to the Arthritis Foundation, fibromyalgia causes pain, tenderness, fatigue, sleep disturbance, frequent headaches, and cognitive difficulties (poor attention span, short-term memory problems, and inability to think clearly). *See* "Fibromyalgia-What are the effects?" *Arthritis Foundation*. 2 0 1 0 . W e b . 1 9 N o v . 2 0 1 0 . http://www.arthritis.org/diseasecenter.php?disease_id=10&df=effects.

   **Applicable Law.**  In ***Grimes v. Barnhart*** the court held that for vocational expert testimony to be substantial, it must be based on complete hypotheticals.  *See Grimes v. Barnhart*, Case No. 04-G-3065-S, 2006 WL 1075253 (N.D. Ala. Apr. 6, 2006).

where claimant could stand for 30 minutes and could sit, stand, and walk for period of at least four hours).

As a general rule, moreover, the ALJ need not rely solely upon vocational expert testimony in determining whether a claimant can perform past relevant work. *See Russell*, 331 F. App'x at 683 n.3 (11th Cir. 2009) ("Generally, the testimony of a vocational expert is not necessary to determine whether a claimant can perform her past relevant work."). "The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3 (1982). "The testimony of a vocational expert is necessary, however, if the record is inconclusive as to the claimant's residual functional capacity." *Russell*, 331 F. App'x at 683 n.3.

The ALJ in this matter devoted considerable attention in his questioning of plaintiff toward documenting the skill level, exertional, and non-exertional demands required by plaintiff's past relevant work. (Doc. 17-2, pp. 32-48). Having reviewed the administrative hearing transcript and documentary evidence, the undersigned finds that the record is determinative of plaintiff's residual functional capacity. Accordingly, any error in the ALJ's reliance on Bradley's testimony was harmless.

On the same point, plaintiff further contends the ALJ erred by not considering the effects of fibromyalgia when posing hypothetical questions to the vocational expert. Again, plaintiff concludes that the ALJ constructed incomplete hypotheticals and therefore could not properly rely on the resulting answers in determining whether plaintiff could perform her past relevant work. Despite advancing this contention,

plaintiff has not provided, or even suggested, the additional information concerning her fibromyalgia, as opposed to some generalized characterization of that condition, that the ALJ should have included.

Fibromyalgia is a diagnosis of exclusion. *See Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 63 (11th Cir. 2010) ("[F]ibromyalgia 'often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms,' and . . . the 'hallmark' of fibromyalgia is therefore 'a lack of objective evidence.'" (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam))).  In other words, fibromyalgia is a syndrome, complex, condition, or disease defined by its symptoms.

In reaching a conclusion as to plaintiff's residual functional capacity, the ALJ expressly considered those symptoms presented by plaintiff and generally associated with fibromyalgia:

> Upon questioning by the Administrative Law Judge, the claimant's testimony revealed the following:  She has pain in her low back and hips and she cannot sit down.  Her hands go numb.  She gets tired from her medication and feels like she is in a fog.  She gets sore all over and sometimes in her neck and shoulders.  She gets occasional migraines.  If she turns her head wrong she hurts everyday.  She wears braces on her hands.  She has arthritis.  She has depression . . . .

(Doc. 17-2, p. 19).  The finding as to plaintiff's residual functional capacity, which formed the basis of the ALJ's hypothetical questions, was therefore properly informed by the pain and complications experienced by plaintiff and associated with fibromyalgia.  Mere insertion of the term "fibromyalgia" would have lent little or nothing to the ALJ's analysis.  Significantly, for this review, the extensive medical

record is virtually devoid of any reference to, or discussion of, fibromyalgia, other than occasional mention by plaintiff herself in her various medical histories.  In a light most favorable to plaintiff, the medical records do not provide data or information helpful in assessing the effect of her fibromyalgia.  For this reason, the undersigned finds no deficiency in the questions posed to the vocational expert, whose answers the ALJ could have relied upon as substantial evidence.

Plaintiff contends next that the ALJ erred by failing to adhere to the applicable pain standard when considering her subjective complaints of pain and the effects of that pain on plaintiff's ability to work.  Plaintiff notes her history of "constant pain" and suggests that the ALJ failed to articulate his reasons for discounting plaintiff's subjective testimony.  As a result, plaintiff argues, that testimony must be accepted as true.[3]  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988) ("Failure to

---

[3] Plaintiff's entire argument on this point reads as follows:

Ms. Dublak suffers from fibromyalgia, bilateral carpal tunnel syndrome, lumbar spondylosis, neck pain, right shoulder pain despite a rotator cuff repair, headaches, and hip pain.  (Tr. 267, 315, 429, 320, 564, 559, 506).  An EMG/NCS done on July 12, 2006 revealed that Ms. Dublak suffers from bilateral carpal tunnel syndrome.  (Tr. 315- 318).  An MRI of the lumbar spine done on September 27, 2007 showed lumbar spondylosis and mild to moderate disc protrusions at L4-5 and L5-S1.  (Tr. 429, 430).  The fact that Ms. Dublak has been on pain medication since 2004 and has received injection after injection from multiple doctors affirms that she is in constant pain.

**Applicable Law.**  The Eleventh Circuit holds that in order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1)

articulate the reasons for discrediting subjective pain testimony, mandates that the testimony, as a matter of law, be accepted as true.").

"The Secretary must consider a claimant's subjective testimony of pain if she finds evidence of an underlying medical condition" (part one of the "three part pain standard" previously enunciated in *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Circuit 1991)), "and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Id.* at 1561.  Failure to cite or refer to the language of the three-part test is not reversible error, however,  where the ALJ cites to 20 C.F.R. § 404.1529, "which contains the same language regarding the subjective pain testimony that [the Eleventh Circuit] interpreted when initially

---

evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Wilson v Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

Further, failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

establishing its three-part pain standard." *See Wilson v. Barnhart*, 284 F.3d 1219,
1226 (11th Cir. 2002).

Here, after considering plaintiff's testimony in accordance with 20 C.F.R. §§
404.1529 and 416.929, the ALJ found reason to discredit plaintiff's complaints of
subjective pain.  For instance, plaintiff alleged that she experienced pain in her hands
24 hours per day, frequently dropped things, had difficulty writing, and could lift only
a half gallon of milk.  (Doc. 17-2, pp. 64, 67, 75).  In the face of such subjective
complaints, however, the ALJ noted a July 2006 nerve conduction study and
electromyogram produced no diagnostic evidence of radiculopathy.  (Doc. 17-7, p.
315).   Dr. Freeman, a treating physician, opined that plaintiff's carpal tunnel
syndrome would not impose any lifting or carrying limitations.  (Doc. 17-7, p. 324).
A consultative examination in September 2006 with Dr. Broky revealed an "intention
tremor" when plaintiff extended her right hand, but no significant tremor with other
maneuvers.  Tremors notwithstanding, plaintiff exhibited 27 pounds of grip in her
right hand and 24 pounds in her left during the examination.  (Doc. 17-7, p. 300).

Plaintiff's complaints of disabling back, neck, and hip limitations were
similarly contradicted by the medical evidence.  An MRI of the cervical spine
performed in May 2006 showed no abnormalities.  (Doc. 17-7, p. 289).  Plaintiff
contended that regularly occurring back spasms allowed her to sit and walk only 30
minutes at a time, and stand approximately 45 minutes.  (Doc. 17-2, pp. 66-67).  From
an objective perspective, though,  magnetic resonance imaging of the lumbar spine
in September 2007 showed only mild lumbar spondylosis and no evidence of
spondylolisthesis.  (Doc. 17-8, pp. 429-30).  Though plaintiff testified that her hip

pain was the worst of her pain, an MRI scan of the left hip performed in September 2007 revealed no significant abnormality.  (Doc. 17-8, pp. 429-30).  In September 2006, Dr. Broky observed that plaintiff exhibited full cervical flexion, 80 degrees of lumbar flexion, normal gait, tandem walking, lower extremity strength, and range of motion in her hips.  (Doc. 17-7, pp. 329-30).

These medical findings are consistent with the wide range of activities in which plaintiff engages on a daily basis.  By her own admission, plaintiff performs light housework, prepares meals, does the dishes and laundry, feeds her cats, goes grocery shopping, drives a car, reads, visits with friends, lifts weights, volunteers at the Salvation Army, attends church and Bible school, pays bills, and cares for her grandchildren.  (Docs. 17-2, pp. 29-30, 68-70; 17-8, pp. 375-76).  Such activities, as the ALJ concluded, "auger against [plaintiff's] allegations of incapacitating pain, or significant fatigue and lack of alertness, and are consistent with the conclusion that she can perform some work activities."  (Doc. 17-2, pp. 20-21).  The ALJ, as here, may consider daily activities.  *See Moore*, 405 F.3d at 1212 ("[T]he ALJ here relied on the inconsistencies between Moore's descriptions of her diverse daily activities and her claims of infirmity.").  Moreover, the ALJ "may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole."  *See Small v. Astrue*, No. 3:08cv44/MCR/MD, 2009 WL 559517, at *13 (N.D. Fla. Mar. 4, 2009) (citing *Moore*, 405 F.3d at 1212).  In short, the undersigned finds "that the ALJ made a reasonable decision to reject [plaintiff's] subjective testimony, articulating, in detail, the contrary evidence as his reasons for doing so."  *See Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002).  With regard to the pain issue, the

undersigned, of course, is not charged with making independent fact conclusions, but only with reviewing the substantiality of the evidence underlying the conclusions reached by the ALJ.  *See Moore*, 405 F.3d at 1211 (11th Cir. 2005).

As her third point, plaintiff alleges that the ALJ failed to consider her fibromyalgia as a "severe" impairment and therefore failed to comply with the Commissioner's policies in evaluating the severity of that disease.  Plaintiff cites the ALJ's omission of any reference to fibromyalgia in his decision as evidence that he did not account for that impairment.[4]  As already explained, fibromyalgia is a

---

[4] Plaintiff's entire argument on this point reads as follows:

Ms. Dublak has a long history of fibromyalgia as can be seen by the fact that every new doctor she goes to notes that she has a history of fibromyalgia.  (Tr. 504, 559).  The ALJ makes no mention of Ms. Dublak's fibromyalgia in his decision, he does not list it as a "severe" impairment nor does he list it as a "non-severe" impairment.  (Tr. 17).  However, the ALJ listed depression and anxiety as "non-severe" impairments.  (Id.).  The ALJ explained his rationale for considering depression and anxiety as "non-severe" impairments due to the fact that Ms. Dublak has no ongoing mental health treatment for these besides being prescribed antidepressant medication by a general practitioner [*sic*].  (Tr. 20).

**Applicable Law.**   The Eleventh Circuit contends that fibromyalgia, "if properly diagnosed" satisfies the pain standard.  *See Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1187 (N.D. Ala. 2006).  In *Dutil v. Barnhart*, 457 F. Supp. 2d 1321, 1327 (M.D. Fla. 2005) a Florida court contended that the ALJ failed to properly evaluate all of the claimant's complaints of pain and diagnosis of fibromyalgia at step two of the sequential evaluation process.  The court noted that several circuits have recognized that fibromyalgia is capable of causing severe,

diagnosis of exclusion, identified by excluding other impairments that could cause symptoms similar to those produced by or associated with fibromyalgia.  In general, courts have noted that symptoms associated with fibromyalgia include severe, widespread musculoskeletal pain, stiffness, numbness, fatigue, sleep disturbances, depression, and trigger points.  *See, e.g.*, *Dutil v. Barnhart*, 457 F. Supp. 2d 1321 (M.D. Fla. 2005).

In the instant matter, the ALJ took note of all plaintiff's symptoms, including numbness in the hands, fatigue and disorientation, general soreness in the neck and shoulders, depression, and joint pain in the hip and shoulder, any or all of which may have been caused by fibromyalgia.  Having undertaken a thorough review of the record evidence, the undersigned is unable to determine that any medical expert identified fibromyalgia as the direct or sole cause of the foregoing symptoms.  Because the ALJ considered the symptoms traditionally associated with fibromyalgia (although not tied to that condition by the actual medical evidence in this case), the undersigned cannot conclude that the ALJ failed to credit the existence or severity of the impairment.  The ALJ agreed, in fact, that plaintiff's "medically determinable

---

disabling pain and that pursuant to the Eleventh Circuit's pain standard[]
the claimant's subjective complaints of pain must be considered.  *Id.*

**In Sum.**  The ALJ not only failed to consider Ms. Dublak's
fibromyalgia a "severe" impairment, he did not mention it at all in his
decision.  As held in ***Ashford v. Barnhart***, 347 F. Supp. 2d 1189 (M.D.
Ala. 2004) an ALJ commits reversible error in failing to explain how
and why evidence failed to support a finding that an impairment is
severe or not, especially if that particular impairment is referenced by
multiple physicians.

impairments could reasonably be expected to produce the alleged symptoms[.]" (Doc. 17-2, p. 19).  The ALJ disagreed, however, with plaintiff's allegations regarding the "intensity, persistence and limiting effects of these symptoms," which he found "not credible to the extent they are inconsistent with the residual functional capacity assessment . . . ." (Doc. 17-2, p. 19).  As detailed above, this ultimate determination is supported by substantial record evidence.  *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

The persuasiveness of plaintiff's argument on this point is further diminished by the ALJ's finding of multiple severe impairments at step two of the sequential evaluation process.  Because step two requires only that the ALJ find at least one severe impairment to proceed to the next evaluative step, any additional consideration given to plaintiff's fibromyalgia as a severe impairment, standing alone, would have been superfluous in this instance.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. June 11, 2010) ("'[T]he finding of any severe impairment . . . whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe' is enough to satisfy step two.") (quoting *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)).  Plaintiff responds that fibromyalgia, in conjunction with her other impairments, so diminishes her residual functional capacity as to make her incapable of performing her past work.  Here, having reached the fifth step in the sequential evaluation, the ALJ recorded and considered the symptoms of which

plaintiff complains.  (Doc 17-2, pp. 19-20).  The undersigned cannot find that the residual functional capacity calculus would have been materially altered by the mere mention of fibromyalgia as a severe impairment where, as here, the ALJ has given at least some credence to all of plaintiff's complaints of disabling pain.

The decision of the Commissioner is supported by substantial evidence.  The decision is similarly in compliance with the proper legal standards.  Accordingly, it is respectfully RECOMMENDED:

The application for disability insurance benefits and supplemental security income benefits be DENIED.

At Pensacola, Florida, this 22nd day of June, 2011.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**